Julianna Rivera Maul (SBN 290955)
The Law Office of Julianna Rivera
420 3rd St., Ste 200
Oakland, CA 94067
Tel: 510-473-2141

Matt Adams*
Aaron Korthuis*
Northwest Immigrant Rights Project
615 2nd Ave, Ste 400
Seattle, WA 98104
Tel: 206-957-8611

*Pro hac vice applications forthcoming

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.R.G. and M.A.R.,[1] | Case No. 4:22-cv-5183 |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

---

[1] Plaintiffs are concurrently filing a motion for leave to proceed under pseudonyms to protect their identities from public disclosure due to the trauma inflicted upon them. Plaintiffs have already disclosed their full names to the relevant government agencies in their administrative claims filed in accordance with 28 U.S.C. § 2675.

**INTRODUCTION**

1.      In 2018, the United States implemented an unprecedented policy of intentionally separating asylum-seeking parents and children at the nation's southern border. While the policy was in effect, U.S. officials systematically and forcibly took children from their parents, causing extraordinary trauma to thousands of families. Plaintiffs J.R.G. and her daughter M.A.R. became victims of this horrific policy when government officials ripped the then eight-year-old M.A.R. away from her mother and sent her to an undisclosed location. J.R.G. and M.A.R. were separated for over ten months.

2.      The trauma that Plaintiffs and other parents and children suffered was not an incidental byproduct of the policy. It was the very point. The government *sought* to inflict extreme emotional distress and other harms on migrant families by forcibly separating them, and then to use that trauma and the media reporting thereon to coerce arriving immigrants to waive their rights to apply for asylum and to deter future asylum seekers.

3.      Federal officials at the highest levels of government repeatedly made public statements acknowledging that this was the policy's purpose. Despite widespread condemnation and a federal-court injunction requiring the government to reunite separated families and to stop further separations, former president Donald J. Trump defended the policy as a deterrent to migration from Central America. Even months after a federal court had ordered an end to the policy, the former president stated on Twitter that "if you don't separate, FAR more people will come." Donald J. Trump (@realdonaldtrump), Twitter (Dec. 16, 2018, 11:25 a.m.), https://twitter.com/realDonaldTrump/status/1074339834351759363.

4.      Plaintiffs' claims concern the entirely predictable—and, in fact, actually *intended*—harms caused by Defendant's unprecedented policy and practice of systematically separating asylum-seeking parents and children. Defendant's employees forcibly separated

COMPL. – 2
Case No. 4:22-cv-5183

Plaintiffs after they entered the United States in May 2018. Defendant's employees then detained Plaintiffs in separate facilities in Texas, even though they should have remained together. But instead, J.R.G. was unable to hold her daughter again until the end of March 2019—when they were finally reunited in Oakland after over ten months of forced separation.

5.       Plaintiffs suffered significant physical and emotional harm as a direct result of Defendant's unlawful conduct and violation of Plaintiffs' constitutional and statutory rights. M.A.R., in particular, who was separated from her mother at age eight, suffered catastrophic emotional and mental harm that continues to this day, and which likely will mark the rest of her life. Yet that is *exactly* what Defendant intended: to wreak havoc on familial ties, to cause lasting harm to children and parents, and to induce panic and fear.

6.       Plaintiffs bring this action to seek compensation for the extraordinary harms they suffered at the hands of the federal government.

7.       Defendant is liable for this conduct under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b)(1), 2671 *et seq.*

## JURISDICTION & VENUE

8.       This Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. §§ 1331 (federal question), 1346(b) (United States as defendant).

9.       On May 19, 2020, Plaintiffs submitted a Claim for Damages Under the Federal Tort Claims Act to each relevant agency. Each Plaintiff also completed Standard Form 95 and provided a detailed description of the basis of their claim.

10.      Defendant has not made a final disposition of Plaintiffs' administrative claims.

11.      Because Defendant failed to make a final disposition of Plaintiffs' claims within six months, Plaintiffs' claims are deemed finally denied. *See* 28 U.S.C. § 2675(a). Accordingly, Plaintiffs have exhausted all potential administrative remedies.

COMPL. – 3
Case No. 4:22-cv-5183

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

12.     Venue is proper in the Northern District of California under 28 U.S.C. § 1402(b) because Plaintiffs reside in this District.

## PARTIES

13.     Plaintiff J.R.G. is a citizen of El Salvador who resides in Oakland, California. Fearing persecution and torture, she fled El Salvador with her daughter, M.A.R., and sought refuge in the United States. J.R.G has since been granted asylum and has lawful status in the United States as an asylee.

14.     Plaintiff M.A.R. is a citizen of El Salvador who resides in Oakland, California. With her mother J.R.G., M.A.R. fled persecution and torture in El Salvador and sought refuge in the United States, and M.A.R. is in the process of receiving asylum status as the daughter of an asylee.

15.     M.A.R. was eight years old at the time of the forced separation described in this Complaint and was a minor at all times during which Defendant's employees detained her.

16.     The United States of America has waived sovereign immunity as to claims under the FTCA and is properly named as a defendant to each of Plaintiffs' claims under the Act. 28 U.S.C. §1346(b)(1).

## FACTUAL ALLEGATIONS

**Defendant's Employees Subjected Plaintiffs Forcibly Separated Them When They Entered the United States to Seek Asylum.**

17.     J.R.G. and M.A.R. are a mother and daughter who fled persecution and torture in El Salvador to seek asylum in the United States.

18.     Plaintiffs entered the United States on or about May 20, 2018, near El Paso, Texas. Shortly after they crossed the border, U.S. Customs and Border Protection (CBP) officers arrested Plaintiffs and transported them to a nearby detention center.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

19.     Immigration officers took Plaintiffs to a CBP facility known as "*hielera*," or "ice box," because of its frigid temperatures. While detained, J.R.G. expressed to officers that she was afraid to return to El Salvador.

20.     J.R.G. and M.A.R. were separated from each other within a day of being placed in immigration custody. At some point during that day, a CBP officer informed J.R.G. that she would be separated from M.A.R. because of a new "law" from the President. The CBP officer told J.R.G. that the separation from her daughter would last only until a federal judge sentenced her for crossing the border. The officer also stated that J.R.G. had no right to seek asylum before an immigration judge and that she was going to be deported.

21.     CBP officers did not provide J.R.G. with any details about where her daughter M.A.R. would be taken or for how long.

22.     Around 1:00 a.m. on May 21, 2018, when J.R.G. and M.A.R. were sleeping, a CBP officer called their names and the names of other families detained in the same room. Aware of the pending separation, J.R.G. began reassuring M.A.R.

23.     The family was then taken to another room. Many other families were also in this room. Many of the children were screaming and crying because CBP was taking them away from their parents.

24.      Eight-year-old M.A.R. began to cry when the officials grabbed her to take her away from her mother. J.R.G. tried her best to stay composed to avoid exacerbating M.A.R.'s reaction to their separation.

25.     After they were separated, J.R.G. did not see her daughter M.A.R. again for over ten months.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

**J.R.G.'s Federal Prosecution and Defendant's Justification for the Initial Separation.**

26.     Soon after CBP took J.R.G. and M.A.R. into custody, Assistant United States Attorney Patricia Acosta approved federal prosecution of J.R.G. under 8 U.S.C. § 1325.

27.     The prosecution was approved pursuant to the Department of Justice's new "Zero Tolerance" policy.

28.     Following her separation from M.A.R., J.R.G. was transferred to the El Paso County Detention Facility pending her hearing in federal court.

29.     On May 22, 2018, a criminal complaint for illegal entry in violation of 8 U.S.C. § 1325 was filed against J.R.G. That same day, she attended an arraignment.

30.     At the federal court hearing, J.R.G. pleaded guilty. She was sentenced to one year of non-reporting and unsupervised probation.

31.     At the time, J.R.G. believed that she would soon be reunited with M.A.R.

32.     J.R.G. was in federal criminal custody only until her arraignment concluded. Afterwards, she was transferred back to the custody of DHS.

33.     In route to the detention center, J.R.G. and other women on the bus shared feelings of happiness, all believing that they would be reunited with their children, as J.R.G. was initially advised by CBP.

34.     Despite prior assurances from CBP, J.R.G. was not reunited with M.A.R. Instead, J.R.G. was placed in chains again and transported to an immigration detention center while M.A.R. was detained in a separate location, unknown to J.R.G.

35.     J.R.G. was devastated to learn that she would not be reuniting with M.A.R. When she asked for information about reuniting with her daughter, J.R.G. was advised that she would

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

only be reunited after her asylum process was finished, a process that could take months. J.R.G. would not see her daughter for another ten months.

36.     J.R.G.'s prosecution under 8 U.S.C. § 1325 was carried out pursuant to a policy launched by the Department of Justice on April 6, 2018. That day, then-Attorney General Jefferson Beauregard Sessions III publicly announced a "Zero Tolerance" directive to all U.S. Attorneys along the southern border, including in Texas, to prosecute anyone who committed the misdemeanor of unlawful entry or re-entry under 8 U.S.C. § 1325(a).

37.     Previously, asylum seekers, especially families, had not been systematically referred for prosecution under this Section. *See, e.g.*, William A. Kandel, Cong. Rsch. Serv., R45266, The Trump Administration's "Zero Tolerance" Immigration Enforcement Policy 6 (2021).

38.     The "Zero Tolerance" directive was conceived of and developed by Attorney General Sessions, Secretary of Homeland Security Kirstjen Nielsen, White House adviser Stephen Miller, and others. The policy was a pretext or cover for the goal of carrying out the widespread separations of Central American parents and children along the southern border. Indeed, Defendant Nielsen later admitted under oath before the House Homeland Security Committee that she had discussed imposing widespread family separations with Sessions before the "Zero Tolerance" announcement. Several reports from Congress and government agencies, including the Department of Justice's Inspector General's office, have since confirmed that the policy was intended to separate families and to deter asylum seekers. *See, e.g.*, Dep't of Justice, Off. of Inspector Gen., No. 21-028, Review of the Dep't of Justice's Planning and Implementation of its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services (Jan. 2021); Majority Staff of H. Comm. on the Judiciary, 116 Cong., Rep. on the Trump Administration's Family Separation Policy:

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

Trauma, Destruction, and Chaos (Comm. Print 2020); *see also* Caitlin Dickerson, "An American Catastrophe: The Secret History of the U.S. Government's Family Separation Policy," *The Atlantic* (Aug. 7, 2022).

39.     After the "Zero Tolerance" announcement, a parent would be prosecuted but usually receive a sentence of time served that amounted to approximately 48 hours or less in jail, after which the parent would be returned to immigration custody. In fact, many, if not most, targets of the Zero Tolerance policy did not serve *any* time in jail.

40.     During the brief time the parent was incarcerated or in non-immigration custody, or even while the parent was still in immigration custody, the child would be taken away, often to unknown locations, and not returned to the parent even after the parent was returned to immigration custody.

41.     As with most Zero Tolerance prosecutions under 8 U.S.C. § 1325(a)(1), J.R.G. was sentenced to no jail time.

42.     J.R.G. was sentenced to only unsupervised and non-reporting probation for one year.

43.     J.R.G. entered federal criminal custody only for the brief time that she was detained at the El Paso Detention Facility from May 21–22, 2018. At all other times both before and after that, J.R.G. was in DHS custody until released in March 2019.

44.     Even though J.R.G. was in federal pre-trial criminal custody for a brief time, Defendant's employees used J.R.G.'s federal court proceedings and prison sentence to designate M.A.R. an "unaccompanied minor." *See* 8 U.S.C. § 1232(b)(1); 6 U.S.C. § 279(b). Specifically, once the Department of Justice approved the criminal prosecution against J.R.G., Defendant's employees used the process that followed, including her required court hearing and her placement in federal pre-trial criminal custody, to render M.A.R. unaccompanied.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

45.     Defendant's employees continued that designation for months *after* J.R.G. was sentenced to probation and her case completed, even though no basis existed to consider M.A.R. unaccompanied.

46.     As a result of that designation, ICE and CBP considered M.A.R. to be legally in the custody of the Department of Health and Human Services' Office of Refugee Resettlement (ORR). ICE and CBP made that determination even though J.R.G. and M.A.R. entered the country together, were initially in immigration custody together, and J.R.G. was never held in a non-immigration detention facility except for the single day she was at the El Paso County Detention Facility.

**Defendant's Employees Detained J.R.G. for Over Ten Months, Keeping Her Separated from M.A.R., Causing Severe Emotional Distress, and Violating a Federal Court Order.**

47.     For over ten months after entering the United States, J.R.G. was detained by ICE at the El Paso ICE Service Processing Center under harsh conditions. During this time, she experienced severe and serious emotional and physical harm as a result of the separation.

48.     This continuing separation occurred despite a federal court order enjoining Defendant's practice of separating families and requiring the government to expeditiously reunify separated families.

49.     In June 2018, J.R.G. was placed in credible fear interview proceedings because she had expressed a fear of return to El Salvador. On June 5, 2018, an asylum officer determined that she did not meet the threshold for a credible fear, and an immigration judge affirmed that finding on June 28, 2018. Despite these initial determinations, an immigration judge subsequently held that J.R.G. satisfies the much more rigorous standard for obtaining asylum, granting her asylum claim on November 24, 2021.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

50.     On June 26, 2018, the federal court in the *Ms. L.* litigation—a nationwide class action on behalf of parents like J.R.G. who had been separated from their children—issued a class-wide injunction requiring the federal government to reunify separated families. Under the terms of the injunction, Defendant was required to reunify J.R.G. and M.A.R. within thirty days and could not remove J.R.G. until reunification was accomplished. *See Ms. L. v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133, 1149–50 (S.D. Cal. 2018).

51.     Nevertheless, J.R.G. languished in detention until March 2019, after DHS reviewed the original negative credible fear finding, reversed its prior conclusion, and concluded J.R.G. had a credible fear.

52.     J.R.G. was not reunified until her release following the positive credible fear finding.

53.     These months in detention were incredibly traumatic, terrifying, and emotionally distressing for J.R.G.

54.     Despite the separation, neither detention center employees nor government officials or employees arranged for a direct call or communication between J.R.G. and M.A.R. J.R.G. also received no information about M.A.R.'s wellbeing, health, or safety from them either, despite asking on multiple occasions, and writing multiple letters requesting information about M.A.R. The responses to the letters provided no information regarding her location or wellbeing, other than to say the child was "safe."

55.     After J.R.G. wrote her further letter, DHS officials held a meeting with her and other mothers at the detention center instructing them to stop writing letters, and simply reasserting that the children were "safe."

56.     J.R.G. was only finally able to first speak to her daughter the following month after J.R.G. and M.A.R. were separated, during a call coordinated through her husband.

COMPL. – 10
Case No. 4:22-cv-5183

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

57.     Even once M.A.R. was released from the custody of ORR on July 12, 2018, J.R.G. was only able to speak with M.A.R. for around 10 minutes during each call.

58.     The continued separation from M.A.R. was devastating emotionally and physically for J.R.G. J.R.G. was unable to properly eat because of the stress, and she experienced depression and anxiety worrying about M.A.R.'s wellbeing, being separated from her, and the unknowns of what would happen to her or M.A.R. As a result, J.R.G lost about 20 pounds during the time she was separated from M.A.R. and she appeared emaciated. Because of her physical appearance, other fellow detainees feared for J.R.G.'s health.

59.     J.R.G. also experienced stomach pains and cramps, chronic constipation, hemorrhoids, and anal bleeding making it painful for her to sit down. She also suffered from a fever and dizziness due to a cervical infection, and during her entire detention, she did not have one menstrual period.

60.     Further, J.R.G. was also unable to sleep, and only slept about two to three hours a day for the first few months of detention. In the beginning of her time in detention, she would have vivid memories of the events surrounding the separation and would begin to worry about M.A.R. when she tried to sleep.

61.     Eventually, J.R.G. was given a sleep aid, but she stopped taking it for fear of dependency, and then experienced insomnia.

62.     As her detention continued, J.R.G. lost hope that she would ever be released and reunited with M.A.R.

63.     Defendant's employees' intentionally cruel implementation of the Zero Tolerance policy, as well as their reckless failure to provide even the most basic safeguards when launching

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

the policy, caused and exacerbated J.R.G.'s and M.A.R.'s difficulties in connecting and reuniting after their separation.

64.    As reports from Congress, the Department of Justice's Inspector General, and the Government Accountability Office have explained, Defendant's employees failed to adequately track separated family members. Defendant's employees also failed to provide ORR with notice that DHS would dramatically expand the number of "unaccompanied" child referrals, thereby overwhelming ORR's capacity to even track which children had been separated from which parents. ORR also failed to take significant steps to prepare for the dramatic expansion of "unaccompanied" children, worsening the deep despair and trauma that separated families experienced. *See, e.g.*, Dep't of Justice, Off. of Inspector Gen., No. 21-028, Review of the Dep't of Justice's Planning and Implementation of its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services (Jan. 2021); Majority Staff of H. Comm. on the Judiciary, 116 Cong., Rep. on the Trump Administration's Family Separation Policy: Trauma, Destruction, and Chaos (Comm. Print 2020); U.S. Gov't Accountability Off., GAO-19-163, Unaccompanied Children: Agency Efforts to Reunify Children Separated from Parents at the Border (Oct. 2018); *see also* Dickerson, *supra* p. 8.

**Defendant's Employees Inflicted Lasting Psychological and Emotional Damage to M.A.R. and Put Her at Physical Risk.**

65.    Because DHS and ICE designated M.A.R. an unaccompanied minor, ORR was charged by law with "coordinating and implementing the care and placement" of M.A.R. 6 U.S.C. § 279(b)(1); *see also* 8 U.S.C. § 1232(b)(1) ("[T]he care and custody of all unaccompanied [noncitizen] children . . . shall be the responsibility of the Secretary of Health and Human Services."). ORR thus remained legally responsible for M.A.R.'s adequate care and safety, including during the time period it contracted with third parties for her custody and care.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

66.     After being forcibly separated from her mother in May 2018, ORR directed that M.A.R. be taken to a shelter operated by Upbring Transitional Foster Care in El Paso, Texas.

67.     Upbring Transitional Foster Care is a non-profit organization that contracts with ORR to provide services to unaccompanied immigrant children.

68.     On or about May 21, 2018, M.A.R. was then presented and placed with a "foster family" with other children—all strangers to her. She was held there, separated from her own family, until she was finally released to her father on July 12, 2018.

69.     M.A.R. was released from ORR custody on July 12, 2018, after her father submitted documents to prove his parentage. However, she would remain separated from her mother until the following March.

70.     Defendant's employees inflicted immense emotional trauma on M.A.R. by ripping her from her mother and placing her in ORR's custody. The separation was the first time in the eight-year-old M.A.R.'s life that she and her mother had ever been apart.

71.     M.A.R.'s actions and emotional struggles following her release to her father reflect the intentional harm Defendant's employees caused. Even after being released into her father's care, M.A.R. was unable to sleep alone. She experienced a lack of appetite, regular and frequent crying for her mother J.R.G., and she was distraught, distressed, and traumatized.

72.     Due to her mental state, M.A.R. required ongoing therapeutic sessions after being released into her father's care. These sessions continued through about May 2019. About six months later, she restarted therapy, which continued until sometime in 2021.

73.     On March 30, 2019, J.R.G. and M.A.R. were finally reunited.

74.     Since their reunification, both J.R.G. and M.A.R. have continued to suffer because of Defendant's deliberate decision to separate them.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

75.     M.A.R. is hypersensitive, cries easily, is hypervigilant about J.R.G.'s wellbeing and expresses fears of further separation. M.A.R. has also experienced nightmares about being separated from J.R.G., and regularly has to co-sleep with her parents for comfort.

76.     J.R.G. has also had repeated nightmares about being separated from M.A.R. She also has recurring anxiety about separation from her family, even though she has been granted asylum and has the right to remain in the United States with her family.

**Defendant's Conduct Harmed Plaintiffs.**

77. As a direct result of the U.S. government's actions, Plaintiffs suffered significant physical and emotional harm.

78.     Federal immigration officers subjected J.R.G. and M.A.R. to harsh and cruel conditions in an *hielera*, forcibly separated them, and prolonged J.R.G.'s detention. In doing so, the U.S. government unlawfully punished J.R.G. and M.A.R. for seeking asylum in the United States—which is statutorily obligated to adjudicate their claims for asylum protection.

79.     Federal immigration officers further inflicted severe emotional distress on J.R.G. and M.A.R. by separating them from one another without any process or accurate and reliable information. The more than ten-month-long separation that followed was part of an unprecedented government practice and policy of forced family separation, specifically intended to inflict harm on Plaintiffs in callous disregard of their legal rights, dignity as persons, and family integrity. Defendants even continued this separation for months despite a court order requiring reunification.

80.     As described above, inflicting severe emotional distress on Plaintiffs and other separated families and children was the very point of the Zero Tolerance policy. Defendant's employees knew very well that such separation would cause significant and lasting trauma.

COMPL. – 14
Case No. 4:22-cv-5183

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

81.     Prior to implementing the policy, a DHS Advisory Panel, ORR officials, and outside medical professionals warned DHS that implementing a family-separation policy would cause catastrophic emotional and psychological harm to separated children and their parents. *See, e.g.*, U.S. Imm. & Customs Enf't, Dep't of Homeland Sec., Rep. of the DHS Advisory Comm. on Family Residential Centers (2016); Jeremy Stahl, The Trump Administration Was Warned Separation Would Be Horrific for Children, Did It Anyway, *Slate* (July 31, 2018); Fernando Stein & Karen Remley, Am. Acad. Of Pediatrics, AAP Statement Opposing Separation of Mothers and Children at the Border (Mar. 4, 2017).

82.     Defendant's employees acted in blatant disregard of these warnings when they separated J.R.G. and M.A.R. for months.

83.     J.R.G. has experienced severe distress, depression, and anxiety as a result of the more than ten months of separation from her young daughter.

84.     M.A.R. has experienced lasting emotional distress and trauma as a result of being forcibly separated from her mother when she was only eight years old.

85.     Defendant's employees are liable to Plaintiffs under the FTCA and relevant state laws.

## CLAIMS FOR RELIEF

### I. Intentional Infliction of Emotional Distress

86.     Plaintiffs reallege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

87.     Defendant's employees acted intentionally and/or recklessly through their implementation of an unprecedented government policy of forcibly separating migrant parents and children.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

1    88.    Defendant's employees engaged in conduct that was extreme and outrageous.

2    89.    Defendant's employees engaged in conduct that caused Plaintiffs severe

3    emotional distress.

4    90.    Under the FTCA, Defendant is liable to Plaintiffs for intentional infliction of

5    emotional distress.

6    **II. Abuse of Process**

7    91.    Plaintiffs reallege and incorporate by reference the preceding allegations in this

8    Complaint as if fully set forth herein.

9    92.    Defendant's employees abused legal processes within their control when, after

10   initiating a prosecution against J.R.G. under 8 U.S.C. § 1325(a)(1), they used the legal

11   proceedings that followed to designate M.A.R. an unaccompanied minor.

12   93.    Defendant's employees improperly made the unaccompanied-minor designation,

13   relying on the legal proceedings following the start of J.R.G.'s prosecution to justify the

14   separation of J.R.G. and M.A.R. and to traumatize them.

15   94.    Even if a temporary separation was legally justified during J.R.G.'s brief time in

16   federal pre-trial criminal custody from May 21, 2018, to May 22, 2018, any basis to designate

17   M.A.R. as an unaccompanied minor evaporated after J.F.G. was sentenced to probation on May

18   22, 2018. Defendant's employees nevertheless continued to enforce separation between J.R.G.

19   and M.A.R. for more than ten months.

20   95.    Defendant's employees' abuse of process caused Plaintiffs severe, lasting harm,

21   including emotional distress.

22   96.    Under the FTCA, Defendant is liable to Plaintiffs for abuse of process.

23

24

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

### III. Wrongful Child Abduction

97.     Plaintiffs reallege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

98.     J.R.G. was legally entitled to M.A.R.'s custody at all times relevant to this action, except during the brief time she served in federal pre-trial criminal custody.

99.     Defendant's employees compelled her minor child M.A.R. to leave J.R.G., with knowledge that J.R.G. did not consent.

100.    Defendant's employees, with knowledge that J.R.G. did not consent, compelled her minor child M.A.R. not to return to J.R.G.

101.    Defendant's employees actively concealed the location of M.A.R. from J.R.G. even after J.R.G. was returned to immigration custody upon completing being sentenced in federal court.

102.    Defendant's interference with J.R.G.'s custody of M.A.R. caused Plaintiffs severe, lasting harm, including emotional distress.

103.    Under the FTCA, Defendant is liable to Plaintiffs for child abduction.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

a.      Compensatory damages in the amount of $3,000,000 for harm to J.R.G. resulting from Defendant's conduct;

b.      Compensatory damages in the amount of $3,000,000 for harm to M.A.R. resulting from Defendant's conduct; and

c.      Such other and further relief as the Court deems just and appropriate, including all equitable relief to which Plaintiffs are entitled.

DATED this 12th day of September, 2022.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

Respectfully submitted,

_s/ Matt Adams_
Matt Adams, WSBA No. 28287*

_s/ Aaron Korthuis_
Aaron Korthuis, WSBA No. 53974*

**NORTHWEST IMMIGRANT RIGHTS PROJECT**
615 Second Avenue, Suite 400
Seattle, Washington 98104
Tel: +1.206.957.8611
Fax: +1.206.587.4025
matt@nwirp.org
aaron@nwirp.org

* _Pro hac vice_ application forthcoming

_s/ Julianna Rivera Maul_
Julianna Rivera Maul, SBN 290955

**THE LAW OFFICE OF JULIANNA RIVERA**
420 3rd Street, Ste 200
Oakland, CA 94607
Tel: +1.510.473.2141
Fax: +1.510.500.9804
julianna@juliannariveralaw.com

*Counsel for Plaintiffs J.R.G. and M.A.R.*

COMPL. – 18
Case No. 4:22-cv-5183

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611